MILLER KORZENIK SOMMERS RAYMAN LLP
Louise Sommers
488 Madison Avenue Suite 1120
New York, New York 10022-5702
Phone (212) 752-9200 Fax (212) 688-3996
lsommers@mkslex.com
Attorneys for Respondent Seeking Alpha, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BofI FEDERAL BANK, a federal savings bank, | Case No. 1:16-mc-00025-P1 |
| Petitioner, | CASE IN OTHER COURT: Case No. 3:15-cv-02353-BAS-NLS (S.D. Cal.) |
| v. | |
| SEEKING ALPHA, INC. | |
| Respondent. | |

**MEMORANDUM OF RESPONDENT SEEKING ALPHA, INC.
IN OPPOSITION TO PETITIONER'S MOTION TO ENFORCE SUBPOENAS
AND IN SUPPORT OF CROSS-MOTION TO QUASH**

MILLER KORZENIK SOMMERS RAYMAN LLP
Louise Sommers
David S. Korzenik
Terence P. Keegan
488 Madison Avenue, Suite 1120
New York, New York 10022-5702
Phone (212) 752-9200
Fax (212) 688-3996
lsommers@mkslex.com
dkorzenik@mkslex.com
tkeegan@mkslex.com
*Attorneys for Respondent Seeking Alpha, Inc.*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ................................................................................................. 2

   Seeking Alpha Is an Open Forum for User Content and Discussion .......................... 2

   Seeking Alpha's Policy on Anonymous Contributors ................................................ 4

   BofI's Service of the Subpoenas .............................................................................. 5

   The Subpoenas' Demands ........................................................................................ 6

   SAI's Objections and BofI's Response ..................................................................... 7

ARGUMENT ...................................................................................................... 9

      BOFI'S MOTION TO COMPEL SHOULD BE DENIED AND THE SUBPOENAS
      SHOULD BE QUASHED ............................................................................. 9

      I.  BOFI HAS FAILED TO SATISFY FIRST AMENDMENT REQUISITES
         FOR COMPELLING ANONYMOUS INTERNET SPEAKER IDENTITIES ...... 9

          A.   BofI's Bare Speculation Does Not Show a Need That Would
              Advance Its Claim ........................................................................ 11

           1.  The Articles Plainly Contradict BofI's Claim of Need .............. 13

           2.  BofI Has Not Satisfied the Need  Requirement as to
              "Real Talk   Investments" ........................................................ 13

i

3.  BofI Has Not Satisfied the Need Requirement as to "Aurelius" .................................................................................... 15

4.  BofI Has Not Satisfied the Need  Requirement as to Posters Who Are Not Authors......................................................... 16

B.     BofI Has Not Made a Concrete Prima Facie Showing of Actionable Harm ............................................................... 17

C.     BofI Has Alternative Sources........................................................ 18

D.     BofI's Subpoena Is Not "Narrow and Discrete" As Claimed ......... 19

E.     The Anonymous Targets Have a Reasonable Expectation of Privacy.......................................................................... 20

II. BOFI HAS FAILED TO MEET BASIC REQUISITES FOR COMPULSION ............................................................................................20

III. THE SUBPOENAS ARE UNDULY BURDENSOME .......................................23

CONCLUSION.................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Cases**

*Am. Broad. Cos. v. Aereo, Inc.*, No. 13-MC-0059, 2013 WL 276124
    (N.D. Iowa Sept. 17, 2013) ......................................................................... 25

*Arista Records LLC v. Doe*, 604 F.3d 110 (2d Cir. 2010) ....................................... 9, 11

*Bates v. City of Little Rock*, 361 U.S. 516 (1960) ......................................................... 9

*Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182 (1999) ................................ 9

*Cohen v. City of New York*, 2010 WL 1837782 (S.D.N.Y. May 6, 2010) .................... 22

*Concord Boat Corp. v. Brunswick Corp.,* 169 F.R.D 44 (S.D.N.Y. 1996) ................... 22

*Corbett v. eHome Credit Corp*, No. 10-cv-262010 WL 3023870,
    2010 WL 3023870 (E.D.N.Y. Aug. 2, 2010) ............................................. 23

*Deer Consumer Prods., Inc. v. Little Grp.*, 2012 WL 5983641
    (Sup. Ct. New York Co. Nov. 29, 2012) .................................................. 5

*Deer Consumer Prods., Inc. v. Little*, 2011 WL 4346674
    (Sup. Ct. New York Co. Aug. 31, 2011) .................................................. 5

*Dendrite Int'l, Inc. v. Doe No. 3*, 342 N.J. Super. 134 (App. Div. 2001) .................... 10

*Dial Corp. v. News Corp.*, 2015 WL 3778533 (May 19, 2015) ................................... 22

*Doe v. 2themart.com, Inc.*, 140 F.Supp. 2d 1088, 1096 (W.D. Wash. 2001) .............. 20

*Evans v. Calise*, No. 92-cv-8430, 1994 WL 185696 (S.D.N.Y. May 12, 1994) ......... 20

*In re Nanoviricides, Inc. v. Seeking Alpha, Inc.*, 43 Media L. Rep. 1082, 2014 WL 2930753
(Sup. Ct. N.Y. Co. June 26, 2014) ............................................................... 11

*Manolis v. Brecher*, No. 11 Civ. 2750, 2013 WL 4044808, at *3 (S.D.N.Y. Aug. 9, 2013) ....... 22

*Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson*, 357 U.S. 449
    (1958) .......................................................................................................... 10

*Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575 (N.D. Cal. 2007) ...................... 23

*Reno v. Am. Civil Liberties Union*, 521 U.S. 844 (1997) ........................................... 10

*Sea Tow Int'l, Inc. v. Pontin*, 246 F.R.D. 421 (E.D.N.Y. 2007) ..................................................... 12

*Sony Music Entm't Inc. v Does 1-40*, 326 F. Supp. 2d 556 (S.D.N.Y. 2004)............................. 11

*U.S v. Berrios*, 501 F.2d 1207 (2d Cir. 1974) ............................................................................ 22

**Rules**

Federal Rule of Civil Procedure 26 ...........................................................................*passim*

Federal Rule of Civil Procedure 45 ...........................................................................*passim*

**MEMORANDUM OF RESPONDENT SEEKING ALPHA, INC.
IN OPPOSITION TO PETITIONER'S MOTION TO ENFORCE SUBPOENAS
AND IN SUPPORT OF CROSS-MOTION TO QUASH**

Respondent Seeking Alpha, Inc. ("SAI") submits this memorandum to oppose Petitioner BofI Federal Bank's ("BofI") Motion to Compel and to support SAI's Cross-Motion to Quash.

**PRELIMINARY STATEMENT**

BofI offers *no factual basis at all* for burdening SAI with multiple Subpoenas seeking "[a]ny and all records and documents" regarding the identities of (i) the person(s) who posted some five articles (the "Articles") critical of BofI that appear on the Seeking Alpha website, www.seekingalpha.com ("Seeking Alpha"); and (ii) "Real Talk Investments" and "Aurelius," each a pseudonymous author (the "Authors") of one or more of the Articles.

BofI's counsel claims merely a "concern" and "belief" from reading the Articles that (i) "Real Talk Investments" and "Aurelius" were in contact with Charles Matthew Erhart ("Erhart") – a former BofI auditor who brought a whistleblower action against BofI, and who is now being sued by BofI in the underlying action for allegedly misappropriating and disseminating BofI's confidential information; and that (ii) those Authors may have obtained BofI's confidential information. But BofI fails to identify any particular alleged confidential information to support BofI's unfounded "suspicion." And the Articles themselves negate its speculation:

- Both Authors plainly state a lack of any communication with Erhart or his counsel;
- Both Authors state that their respective Articles are based only on publicly available information obtained online;
- The Articles disclose their publicly available sources, which include BofI itself.

BofI contends that SAI should be compelled to unmask the Authors and posters so BofI can test their Articles' statements in deposition. But mere conjecture is not a legitimate reason to do so, under either Fed. R. Civ. P. 26 or 45. Nor is it a valid rationale to pierce First Amendment

protection afforded SAI to publish anonymous internet speech and protect anonymous speakers on Seeking Alpha.  Even less valid or permissible is the newly disclosed reason for the Subpoenas: BofI's desire to find any substance for its theory that Erhart may have "conspired," and the Authors may have "participated," in some "short seller" stock manipulation scheme. With BofI having pleaded no such facts – or any such claim – in its underlying complaint, this amounts to nothing more than a fishing expedition.  To that end, BofI's Subpoenas are an improper and unfounded attempt to manufacture a cause of action – targeting the Authors and posters whose identifying information it seeks – and silence critical voices.

Indeed, despite their pseudonymity, BofI could have contacted the authors directly to ask about their Articles, through one of the three ways publicly provided on Seeking Alpha for doing so.  It also could examine Erhart, who as a defendant is available for deposition in the underlying suit, about the Articles and the Authors' denials of contact with him.  BofI chose instead to pursue SAI, with charges that SAI avoided service (nonsensical, given the availability of SAI's statutory and registered agents) and asserted "bogus," "boilerplate" Objections (equally unfounded, as shown, under applicable rules and law).

BofI should not be permitted, as it seeks here, to use these Subpoenas to violate SAI's First Amendment safeguards, rummage through its files, disrupt its relations with its third party contributors, distract it from its proper business, burden it with an extensive document collection and subject it to additional costs – all so BofI can exert the pressure of depositions to silence its critics, while "investigating" for some cause of action that it presently does not have.  BofI's motion to compel should be denied, and the Subpoenas should be quashed.

## BACKGROUND

***Seeking Alpha Is an Open Forum for User Content and Discussion.*** Seeking Alpha is a free online platform and source for investment research, opinion and discussion.  It functions

2

partially as a virtual bulletin board, and entirely as an open discussion forum, publishing

commentary and articles and providing a means of engaging in dialog about U.S. financial

markets.  Insight is overwhelmingly provided by third-party investors, industry experts and buy-

side analysts.  The site is accessible by global Internet users.  Declaration of Eli Hoffmann dated

February 2, 2016 ("Hoffmann Decl.") ¶2; see "About Seeking Alpha," posted at

http://seekingalpha.com/page/about_us (informing users of the general nature of the site).

    As that webpage advises, "Opinion & Analysis is our bread and butter."  Seeking Alpha

publishes crowd-sourced analysis and discussion that is informed and sophisticated, and

primarily consists of articles and posts from more than 10,000 third-party contributing authors

and 280,000+ third-party commenters.  It publishes about 5,200 third-party analysis pieces

monthly.  It has a large and influential readership that includes money managers, business

leaders, journalists and bloggers.  The site serves as a place for vibrant and intelligent discussion

– and sometimes contested debate – about stocks, some 12,780 companies and other financial

matters.  Hoffmann Decl. ¶3.

    Seeking Alpha's tagline is "Read. Decide. Invest," as stated on the footer of the website's

home page.  This sums up its approach: to give its users a place to review and test others'

opinions and analyses, form their own views based on what they read, and make their investment

decisions based on their informed assumptions. Hoffmann Decl. ¶4; see http://seekingalpha.com.

    Seeking Alpha's contributor platform is powered by real investors – not salaried staff

researchers or journalists.  As stated by Eli Hoffmann, SAI's CEO and Seeking Alpha's Editorial

Director, "Because we're contributor driven, all views you read on SA are those of our

contributors (we have more than 3,000 active contributors).  There is no house opinion."

Hoffmann Decl. ¶5; *see* http://seekingalpha.com/article/2096573-why-seeking-alpha-embraces-

pseudonymity.

The coverage of a particular stock, company or entity on Seeking Alpha is completely dependent upon the articles submitted to Seeking Alpha on that subject.  The more articles that contributors submit on a particular subject, the greater the likelihood that Seeking Alpha will publish more articles about it.  Seeking Alpha does not request that contributors cover certain stocks or topics.  In general, however, when a subject receives exposure in more general news outlets such as the *New York Times*, as BofI admits it did, more contributors are interested and submit more articles on that subject, resulting in greater coverage of that subject on Seeking Alpha.  Hoffmann Decl. ¶6.

***Seeking Alpha's Policy on Anonymous Contributors.***  To allow contributors to reach a broad investing public interested in reading and discussing their ideas, Seeking Alpha permits contributors, if they prefer, to remain anonymous to the public.  As made clear on the site's "Policy on Anonymous Contributors" ("Policy"), the site assumes that its "readers desire rigorous and insightful research and opinion on the stocks and sectors they follow – the author is ultimately less important than the ideas conveyed."  Hoffmann Decl. ¶7 and Ex. A; http://seekingalpha.com/page/ policy_anonymous_contributors.

Seeking Alpha responsibly manages its commitment to contributors' anonymity.  Its Policy makes clear that it "holds [its] anonymous contributors to the same compliance and biographical standards as contributors who write under their own name."  Hoffmann Decl. ¶8 & Ex. A.  Use of a pseudonym must be clearly stated on an author page, and stock positions must be disclosed.  *Id.*

Inquiries to pseudonymous authors can be made directly: by sending a direct message to the author through a "Send Message" link under the author's name on the top of the first page of an article; by clicking on the "envelope" icon on the top of an author's webpage (indicating "send

message" when scrolled over); or by submitting an email for the site to forward to the author, as indicated in the Policy (Hoffmann Decl. Ex. A).  Hoffmann Decl. ¶9; Declaration of Louise Sommers dated February 3, 2016 ("Sommers Decl.") ¶¶10-12 & Ex. 2.

One of the reasons contributors prefer to publish under pseudonyms, and why Seeking Alpha respects that choice, is that "[i]t is not uncommon for [Seeking Alpha] contributors to do ground-breaking research on potentially fraudulent or unethical companies that could place them at serious risk."  Hoffmann Decl. ¶10 & Ex. B (http://seekingalpha.com/article/2096573-why-seeking-alpha-embraces-pseudonymity).  Consistent with that recognition, in 2013 NASDAQ announced that it was delisting the company Deer Consumer Products, Inc. ("Deer"), which had brought a libel lawsuit over articles by a pseudonymous author posted on Seeking Alpha (see *Deer Consumer Prods. Inc. v. Little Grp.*, No. 650823/2011) (Sup. Ct. New York Co.). [1]  According to that pseudonymous author, NASDAQ delisted Deer for engaging in some of the very conduct challenged in those articles.  See Alfred Little, *The Bell Tolls For Deer Consumer Products* (Oct. 10, 2012), available at http://seekingalpha.com/article/917371-the-bell-tolls-for-deer-consumer-products.  The Deer delisting serves as an example of how legal disputes may be manufactured to improperly deflect from conduct disclosed by an anonymous author, and to silence or discredit valid criticism. Hoffmann Decl. ¶11 & Ex. C.

**_BofI's Service of the Subpoenas._**  SAI received three Subpoenas, identical in substance and demand.  Two were dated December 1, 2015: one was left at SAI's Vanderbilt Avenue office in New York, and the other was served on its Vice President of Sales on the weekend, at her *home*.  The third Subpoena, dated December 3, 2015, was served on SAI's Delaware agent for the service

---

[1] The *Deer Consumer Products, Inc.* Court dismissed Deer's defamation claim against Seeking Alpha, Ltd. in 2011, *see Deer Consumer Prods., Inc. v. Little*, 2011 WL 4346674 (Sup. Ct. New York Co. Aug. 31, 2011), and against the alleged authors in 2012, *see Deer Consumer Prods., Inc. v. Little Grp.*, 2012 WL 5983641 (Sup. Ct. New York Co. Nov. 29, 2012).

of process.  SAI did not receive the Subpoena dated November 23, 2015 attached to BofI's motion

(Declaration of Alejandro E. Moreno dated Jan. 13, 2016 ("Moreno Decl.") Ex. F).  Hoffmann

Decl. ¶16. [2]  At no time did SAI attempt to "avoid" service in this case (BofI Mem. 8, n.2).

Hoffmann Decl. ¶¶16-21.

       BofI contends that its process server could not gain access to SAI's Vanderbilt Avenue

office for six days, starting with November 24.  That is hardly surprising, as that day marked the

beginning of SAI's New York office staff taking vacation time in anticipation of the Thanksgiving

holiday (November 26).  The office was closed in observance of the holiday, and then the weekend,

from the afternoon of Wednesday, November 25 through Sunday, November 29.  Hoffmann Decl.

¶20.  Given that BofI could have (and did) serve a Subpoena on SAI's registered agent, that BofI

chose to spend $570 on additional process service was indeed, as its counsel put it, "unnecessary."

Moreno Decl. ¶18. [3]

       ***The Subpoenas' Demands.***  The Subpoenas seek "*any and all records and documents*

regarding the identification" of the "person or persons who posted" the five referenced Articles

(Requests 1 and 3, emphasis added), and the "person or persons identified" on www.seekingalpha.

com as "Real Talk Investments" and "Aurelius" (Requests 2 and 4).  Requests 1 and 3 make clear

that this includes "*any and all information* provided to you by the person or persons who authored

the Postings" (emphasis added), and Requests 2 and 4 make clear that this includes "*All* names,

mailing addresses, phone numbers, email addresses, date of account creation and all other

---

[2] Federal Express Tracking for the envelope addressed to "CUSTODIAN OF RECORDS[,] SEEKINGALPHA.COM," WHICH BofI includes in its papers (tracking number 7750 4550 5156, copied on the last page of Moreno Decl. Ex. L) shows that a shipment label was created, but does not indicate any shipment.  Sommers Decl. Ex. 5.

[3] SAI duly furnished the New York Department of State with its updated address to which process should be forwarded if process for SAI is served on the Secretary of State, but the New York Department of State's website apparently still has not changed SAI's former address in its public listing for SAI.  Hoffmann Decl. ¶18.

identifying information associated with the Account[s]" of "Real Talk Investments" and "Aurelius" (emphasis added).  Also sought are various "Internet Protocol address[es]" (Requests 1-4) and "[t]he browser/device used" by each author (Requests 1 and 3).  See Hoffmann Decl. ¶13 & Ex. D.

Four of the Articles referenced by the Subpoenas are by "Real Talk Investments," including the one entitled "Buyer Beware: BOFI Related Party Loans" that BofI references. [4]  Hoffmann Decl. Ex. E; BofI Mem. 2, 6.  The fifth Article is by "Aurelius," entitled "BofI: Risky Loans To Undisclosed, Off-Balance Sheet SPEs Found Disguised Within Mortgage Warehouse Portfolio." [5]  Hoffmann Decl. Ex. F.  Both authors disclose that they are "short BOFI," indicating that they hold a short position in the stock of BofI Holding, Inc., publicly traded on the Nasdaq exchange under the "BOFI" symbol.  Hoffmann Decl. Exs. E, F.

***SAI's Objections and BofI's Response.***  Pursuant to Fed. R. Civ. P. 45(d)(2)(B), SAI timely served BofI with Objections to the Subpoenas on December 17, 2015.  As shown, those Objections were reasonably grounded under the Federal Rules and First Amendment case law, and tailored to BofI's Requests. [6]  As indicated in the letter containing the Objections, SAI counsel also invited BofI counsel to speak further, offering her direct telephone line to facilitate

---

[4] Nov, 4, 2015, *available at* http://seekingalpha.com/article/3641526-buyer-beware-bofi-related-party-loans (last visited Feb. 2, 2016).

[5] Nov. 19, 2015, *available at* http://seekingalpha.com/article/3699616-bofi-risky-loans-to-undisclosed-off-balance-sheet-spes-found-disguised-within-mortgage-warehouse-portfolio (last visited Feb. 2, 2016).

[6] BofI contends that SAI failed to "sufficiently articulate the basis for" its First Amendment objection," BofI Mem. 13, but SAI's Objection Nos. 1 and 2 are more than sufficient:

  1. SAI objects to the disclosure of information sought because it is protected or privileged from disclosure under the First Amendment, or other law.

  2. SAI objects to disclosure of the information sought because the issuing party has made no sufficiently concrete showing, required by the First Amendment which otherwise prevents disclosure of anonymous internet speaker information, of a prima facie claim of actionable harm; nor has the issuing party shown the absence of alternate sources for the information sought and a central need for the information to advance the issuing party's claims; requested discovery with sufficient specificity; given notice of the Subpoenas to the anonymous authors; or satisfied other requisite factors including but not limited to the balancing of privacy and other interests against the need for disclosure.

contact.  Sommers Decl. ¶3.

Instead of receiving a phone call, SAI counsel received on December 21 a four-page, single-spaced letter that contained misstatements, labeled SAI's Objections as "obstruction" (which they were not), and threatened to seek a fee award if SAI did not produce the documents sought by the date BofI arbitrarily set for compliance.  Because of these charges, SAI counsel responded by letter, as well, on December 23, 2015.  Moreno Decl. Exs. P, Q.  SAI counsel pointed out, among other things, that to compel the confidential identity of an anonymous internet speaker, the First Amendment and the Second Circuit required that BofI make a showing that his letter did not satisfy.  For example, although BofI claimed that certain of the Authors' articles indicated that Erhart may have shared BofI's confidential information with them, the Authors stated quite clearly that they relied only on public information (which the Articles' content appears to support) and/or that they had never communicated with Erhart.  Sommers Decl. ¶4.

SAI counsel's December 23 letter also advised that she could discuss this further after she returned from the holidays.  In the subsequent telephonic "meet and confer" BofI's counsel insisted that SAI should simply unmask the Authors, and that BofI was entitled to depose the Authors to test their Article statements under oath.  Given the seriousness with which Seeking Alpha takes anonymous speech and its First Amendment considerations, it was apparent to SAI counsel that the Subpoenas could not be resolved, and BofI's counsel indicated that it would be moving to compel.  Sommers Decl ¶¶5-7. [7]

---

[7] SAI counsel also advised BofI counsel that others had communicated with other pseudonymous authors directly using Seeking Alpha, and suggested he look into trying that here.  He stated that, instead, BofI would seek to have a notice placed in the comments section of the Articles once BofI filed a motion to compel, as counsel had done in other matters.  Sommers Decl. ¶7.

Notably, BofI's counsel did not reveal in that "meet and confer," as its memorandum ("BofI Mem.") now indicates, that its purpose was rather to hunt around for support for a theory that "Erhart conspired" and perhaps the "anonymous posters . . . participated" in a "short seller scheme" to manipulate the share price of BofI's stock.  BofI Mem. 1, 2, 5, 15-16; Sommers Decl. ¶8.

## ARGUMENT

### BOFI'S MOTION TO COMPEL SHOULD BE DENIED AND THE SUBPOENAS SHOULD BE QUASHED

I.   **BOFI HAS FAILED TO SATISFY FIRST AMENDMENT REQUISITES FOR COMPELLING ANONYMOUS INTERNET SPEAKER IDENTITIES**

The right to remain anonymous has been settled in numerous constitutional contexts. *See, e.g.*, *Nat'l Ass'n for Advancement of Colored People v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)(state could not compel the NAACP to reveal lists of members' names and addresses); *Bates v. City of Little Rock*, 361 U.S. 516 (1960) (upholding NAACP's refusal to provide members' names to municipal officials).  The free speech guarantee of the First Amendment is no exception.  *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 199-200 (1999)(First Amendment violated by statute that required persons who circulated petitions to reveal their names).  That the free speech guarantee of the First Amendment extends to the Internet, a recognized forum for robust exchange and debate, is well established.  *See, e.g.*, *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997) ("Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox"); *Arista Records LLC v. Doe*, 604 F.3d 110, 118 (2d Cir. 2010) ("*Arista*") ("the Internet is a valuable forum for the exchange of ideas").

Courts have recognized the danger posed to protection of an Internet-facilitated exchange of ideas, by litigants that seek to unmask and silence Internet critics by subjecting them – and the

9

websites or internet service providers ("ISPs") to which they entrust their identities – to costly or burdensome legal proceedings:

> [W]e should protect against "[t]he use of subpoenas by corporations and plaintiffs with business interests to enlist the help of ISPs via court orders to silence their online critics[, which] threatens to stifle the free exchange of ideas."

*Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32, 45 (1st Dep't 2011) (citation omitted) (pre-action discovery request to reveal anonymous account holder denied); *Dendrite Int'l, Inc. v. Doe No. 3*, 342 N.J. Super. 134, 156 (App. Div. 2001) (corporation's request to Yahoo to reveal anonymous online poster denied).  Whether the identity information is sought from the anonymous speaker, or from the provider that houses the posting, either may properly contest disclosure within the limits of the First Amendment protection.  *See, e.g.*, *In re Nanoviricides, Inc. v. Seeking Alpha, Inc.*, 43 Media L. Rep. 1082, 2014 WL 2930753 (Sup. Ct. N.Y. Co. June 26, 2014) (denying attempt to obtain pre-action disclosure from SAI of identity of pseudonymous author of article posted on Seeking Alpha).

As SAI has shown, the vigorous debate and exchange of ideas and insights among third-party authors and other Seeking Alpha users provide a quintessential illustration of the value to the investing public of protected speech, including anonymous speech that is critical of institutions such as BofI.  *See* Hoffmann Decl. ¶¶22, 23, 25.  The Articles in issue, commenting critically on BofI, its practices and the alleged questionable conduct of its management, are of significant interest and concern to the public, and, as alleged by its former auditor Erhart, may also interest regulators.  Precisely the concerns raised by such critiques should prompt this Court to be vigilant to ensure that the instant Subpoenas are not simply an attempt – as they appear to be here – to silence critics and stifle the free exchange of critical information.

The Second Circuit recognizes that "[t] o the extent that anonymity is protected by the First Amendment, a court should quash or modify a subpoena designed to breach anonymity."

10

*Arista*, 604 F. 3d at 118.  And Fed. R. Civ. P. 45(c)(3)(A)(iii) provides that the "court for the district where compliance is required must quash or modify a subpoena" when it "requires disclosure of privileged or other protected matter, if no exception or waiver applies."  That is the case here.

In *Arista*, the Second Circuit adopted the standard utilized by the Court in *Sony Music Entm't Inc. v Does 1-40*, 326 F. Supp. 2d 556, 564-65 (S.D.N.Y. 2004), to determine whether to preserve anonymity and deny the requested unmasking of an anonymous internet speaker:

> in the analysis of whether the qualified privilege requires that the subpoena be quashed, the principal factors include (1) [the] concrete[ness of the plaintiff's] showing of a prima facie claim of actionable harm, . . . (2) [the] specificity of the discovery request, . . . (3) the absence of alternative means to obtain the subpoenaed information, . . . (4) [the] need for the subpoenaed information to advance the claim, . . . and (5) the [objecting] party's expectation of privacy.

604 F.3d 110,119 (*citing Sony Music*, 326 F.Supp.2d at 564-65).  Contrary to BofI's contentions, a consideration of these factors weighs in favor of SAI's First Amendment protection.  BofI's motion to compel should be denied and the Subpoenas should be quashed.

### A.  BofI's Bare Speculation Does Not Show a Need That Would Advance Its Claim.

Tellingly, BofI shifts its alleged need for the subpoenaed information in its papers.  First it contends that the information sought is to determine whether Erhart communicated with "Real Talk Investments" or "Aurelius," the pseudonymous Authors of the Articles posted on Seeking Alpha cited by BofI, and whether these Authors used BofI's purported confidential information.  Moreno Decl. ¶¶13, 15, 22.  See also BofI Mem. 6-7.  As shown *infra*, the Articles themselves confirm that there is no basis for any such "belief," "concern" or "suspicion" claimed by BofI, as the Articles themselves indicate that the Authors did not engage in either conduct.[8]  *See Sea Tow*

---

[8] BofI argues (without specifying any particular alleged confidential information) that the Authors may have used its confidential information because Erhart had already made it public.  BofI Mem. 7.  If that is the case, such information was public at the time of any alleged use by the Authors, and if used, it would

*Int'l, Inc. v. Pontin*, 246 F.R.D. 421, 425-26 (E.D.N.Y. 2007 ) (subpoena quashed where defendants represented "that Stein possesses specific personal knowledge as to how defendants allegedly violated the Licensing Agreement," but "defendants have not identified what that specific personal knowledge is").  Therefore there is no basis for finding that revelation of the identities of the Authors – much less other persons who might have posted the Articles – would lead to any information *whatsoever* that would advance BofI's underlying claim.

Yet BofI also takes pains to label the two Authors as "short-sellers." [9] Moreno Decl. ¶13; BofI Mem. 13.  Apparently, it does so to claim – even though it fails to justify – the Subpoenas' apparent purpose: BofI is "investigating" whether Erhart "conspired with others to manipulate BofI's share price," and it "*also seeks to determine whether the anonymous posters have knowledge of or have otherwise participated in a short seller scheme*."  BofI Mem. 5, 15-16. BofI offers not one fact to connect these Authors – much less any non-Author posters – with any "short seller scheme."  And BofI has already blamed an October 13, 2015 *New York Times* article as having caused its stock to plummet (BofI Mem. 4).  Nevertheless, BofI's CEO has been vowing publicly, since at least the date of the stock drop, that "by the time we are done, we will find a coordinated effort with the media, with short-sellers, and with Mr. Erhart to provide a variety of material non-public information."  Sommers Decl. ¶9 & Ex. 1.  The Subpoenas here, apparently, are improper tools in that mission.

Thus, BofI has engaged in an zealous pursuit of SAI, with all the concomitant disruption, burden and expense this has caused, and will cause SAI, just so it can rummage around for some

_____

be publicly sourced in the Article. Thus the Authors would have no relevant information to assist any underlying claim against Erhart, whether for "damages" or otherwise.

[9] The Authors make no secret of holding a "short" *position* in BOFI, but they make no statements as to whether they have closed any short *sales* of the stock.  In any event, they properly disclose their positions along with their Articles, and as shown, "Real Talk Investments" explains why. See pp.13-14, *infra*.

cause of action – aimed at Erhart, but also the Authors and non-author posters – that it presently does not have. That is neither sufficient "need" to overcome the First Amendment privilege here, nor a legitimate use of the Subpoenas.

> **1.** ***The Articles Plainly Contradict BofI's Claim of Need.*** There is simply no basis for the "concern[ ]" or "belie[f]" of BofI's counsel that apparently fueled these Subpoenas (Moreno Decl. ¶¶12-13), and thus no need for the information sought as it would not advance BofI's underlying claim – which does not include assertions of a "short seller scheme". And there is no reasonable indication that either Author has had contact with Erhart or has information other than what was generated by or available to BofI in the public record.

BofI admits that there was an "uptick" in coverage of BofI following the *New York Times* article in October 2015. BofI Mem. 9. That would be logical, as the coverage of a particular subject on Seeking Alpha is completely dependent on the articles submitted by contributors, who themselves often submit more articles on subjects when they receive exposure in outlets such as the *New York Times*. Hoffmann Decl. ¶6.

> **2.** ***BofI Has Not Satisfied the Need Requirement as to "Real Talk Investments."*** BofI counsel contends that after reading an November 4, 2015 article by the author "Real Talk Investments" titled "Buyer Beware: BofI Related Party Loans," he became "concerned" that the author had "been in contact with Erhart" and/or "accessed BofI's confidential information." Moreno Decl. ¶12. But BofI fails to specify any particular alleged confidential information that the Article reveals. And "Real Talk Investments" states plainly in that Article (Hoffmann Decl. Ex. E, p.5):

> I also want to get this out of the way right now before I dive into the insider loans. I am not Charles Erhart. *I have never spoken to Charles Erhart* by phone, email, or any other form of communication. *I do not know Charles Erhart* on any level other than reading information available online. *I am not Carol Gillam* [Erhart's

13

lawyer]. *I have never spoken to Carol Gillam* by phone, email, or any other form of communication. I do not know Carol Gillam on any level other than reading information available online.

….

*I dug all of this up through simple public records and legal records searches.* [10]

BofI charges that this Article references many of the allegations made by Erhart against BofI, such as BofI "lacking 'strong internal controls'" and "failing to make 'an external investigation into Erhart's claims.'"  Moreno Decl. ¶12.  But as Erhart's allegations had been publicly reported by news outlets and echoed in a Shareholder Complaint, there is no basis to believe that they were obtained directly in communications with Erhart.  See Sommers Decl. Exs. 8-9.  Thus, the *New York Times*, as early as October 13, 2015, noted that "Mr. Erhart's [publicly filed] complaint seeks to paint a picture of a bank where controls often did not apply." Sommers Decl. Ex. 9.  And a class action suit filed in October, 2015 also alleged that internal controls were frequently disregarded.  Sommers Decl. Ex. 8.

As for a "lack" of an "external investigation," the Article indicates that was a conclusion reached by the Author, after considering BofI's publicly available materials discussing who performed an investigation for BofI.  For example, BofI's October 15, 2015 press release made no mention of an outside investigation, but rather stated that "an *internal* investigation was conducted."  Sommers Decl. Ex. 6.  And the Author was apparently correct.  BofI's Chairman admitted at its Annual Stock Holders Meeting weeks before the date of the Article that BofI's "External Auditors … had not evaluated the allegations and the report" of BofI's internal investigation, and that admission was made public in a transcript.  Sommers Decl. Ex. 7.

---

[10] Real Talk Investments' other articles also make clear the Author's reliance on public information.  For example, in what appears to be the Author's first Seeking Alpha article on BofI, "Buyer Beware: More Odd Behavior from BofI," the Author states: "*Before BOFI's management tries to accuse me of wrongdoing, let me make perfectly clear that all of this information was sourced from publicly available information.*"  See http://seekingalpha.com/article/3620436-buyer-beware-more-odd-behavior-from-bofi (last visited Feb. 3, 2016).

There is thus nothing in this Article that could reasonably fuel a concern that "Real Talk

Investments" had contact with Erhart or was privy to BofI's confidential information, or that the

Author relied on sources that were not publicly available.  Hoffmann Decl. Ex. E.[11]  Likewise,

BofI cites no facts to connect this Author to a "short seller" conspiracy with Erhart to manipulate

the stock price – and there are no allegations regarding any such scheme in BofI's First Amended

Complaint in the underlying action. *Compare* Moreno Decl. Ex. A, *with* BofI Mem. 5, 15-16.

But the Author goes on to state in that Article:

> I want to make this clear [that the Author had no contact with Erhart or his
> lawyer] because Mr. Garrabrants [BofI's CEO] *has been trying to create the false
> illusion of a short-seller conspiracy.* I began looking into the glaring disclosure
> problems at this company long before Erhart's lawsuit. Seeking Alpha articles
> detailing the history of connections to stock promoters such as Tobin Smith and
> the weak disclosures around its lending practices were enough to get me
> interested in initiating a short position and conducting research.
> …..
> I think this article provides strong evidence that Greg's [Garrabrants, *BOFI's
> CEO] claims around some [short seller] conspiracy are unfounded.*

These comments may hold the key to these Subpoenas.  To the extent the Subpoenas attempt to

pressure and silence this critic by painting that Author as part of BofI's "short seller conspiracy"

theory, they are improper.  BofI Mem. 16.

### 3. **_BofI Has Not Satisfied the Need Requirement as to "Aurelius."_**  BofI likewise

claims that its counsel "believe[s]" that pseudonymous author "Aurelius" has been in contact

---

[11] Real Talk Investments' other articles also make clear its reliance on public information. For example, in
the Author's first Seeking Alpha article on BofI, "Buyer Beware: More Odd Behavior from BofI," the
Author states: "*Before BOFI's management tries to accuse me of wrongdoing, let me make perfectly clear
that all of this information was sourced from publicly available information.*" http://seekingalpha.com/
article/3620436-buyer-beware-more-odd-behavior-from-bofi.  And in the Author's most recent Seeking
Alpha article on BofI, "Former BofI Head Auditor's Career History Raises Questions About His
Declaration," the Author analyzes the Declaration of Jonathan Ball that BofI filed in the underlying case,
providing a link to a copy of it "so that readers can come to their own conclusions regarding the court
filing."  Hoffmann Decl. Ex. H; http://seekingalpha.com/article/3759586-former-bofi-head-auditors-
career-history-raises-questions-about-his-declaration.  Although the Author also references Erhart's prior
allegations, the Author again makes it clear the article is based on information "obtained from public
sources." *Id.*

with Erhart because of Aurelius' November 5, 2015 article, posted on Seeking Alpha – yet not

referenced in the Subpoenas – titled "Recent BOFI Court Filing Confirms Existence of

Undisclosed Subpoenas and Nonpublic Government Investigations." Moreno Decl. ¶13.

However, in that article, Aurelius plainly states (Hoffmann Decl. Ex. G, p.2):

> Note: The author has no relationship of any kind with Mr. Erhart or his lawyers.
> This article is based entirely on publicly available documents. The court
> documents are publicly available on the federal PACER system. The case number
> is 3:15-cv-02353-BAS-NLS, *BofI Federal Bank v. Erhart et al*.

Although this Article only appears to reference allegations from BofI's own case filings,

BofI nevertheless contends that the "level of detail" and "explicit incorporation of Erhart's

contentions against BofI suggests" that Aurelius "may have been in contact" with Erhart or his

counsel. Moreno Decl ¶13. However, again BofI specifies no detail that apparently could not

have been obtained from the public records. For example, BofI points to the language that states

that "Erhart allegedly assembled a trove of digital files, screenshots, and emails apparently in an

effort to document his claims." *Id.* But the Article references for these statements the

Declaration of BofI's own Digital Forensic Examiner Matthew Armstrong in the underlying

case: asserting, for example, that "the Erhart BofI Laptop was used to attempt to copy

approximately 1,208 files to a removable storage device." That Declaration also references

"recorded phone calls" and "screenshots," both consistent with the term "digital files." [12]

Likewise, in the Aurelius Article on which BofI *has* subpoenaed SAI, the Author

explicitly states: "Note: All information for this article was derived *from publicly available*

*information*." Hoffmann Decl. Ex. F at 1 (emphasis supplied).

### 4. *BofI Has Not Satisfied the Need Requirement as to Posters Who Are Not Authors.*

---

[12] "Declaration of Matthew D. Armstrong in Support of BofI Federal Bank's Motion for Preliminary Injunction," *BofI Fed. Bank v. Erhart*, No. 3:15-cv-02353-BAS-NLS (S.D. Cal.), Dkt. No. 7-2, at ¶¶3, 11, 18; see also Hoffmann Decl. Ex. G.

BofI makes no attempt to justify its overbroad request for "[a]ny and all records and documents" identifying any person(s) "who posted the [A]rticles," particularly if they did not author them or supply their content.  There would thus appear to be no need for any such documents at all.

In sum then, this "need" factor overwhelmingly weighs in favor of SAI, and should in and of itself warrant denial of BofI's motion to compel.  Its Subpoenas should be quashed.

### B.  BofI Has Not Made a Concrete Prima Facie Showing of Actionable Harm.

BofI's allegations of Erhart's wrongful dissemination of confidential information are also insufficient to satisfy its burden to show a concrete *prima facie* case in the underlying action.

BofI argues that it has "done better than set forth a prima facie claim against Erhart because it has obtained a TRO entered by a United States District Judge."  BofI Mem. 14.  But the TROs BofI submits (Moreno Decl. Exs. B, C) – each entered pursuant to a "joint motion" by BofI and Erhart – were stipulated orders that were not based on any showing by BofI as to the merits of its case (on a *prima facie* basis or otherwise). [13]  They do not include any findings in BofI's favor or as to the merits of its case, and they include provisions to protect Erhart,  Thus, the TROs expressly provide (Moreno Decl. Exs. B, C):

> Nothing contained in this order or the concurrently filed joint motion for entry of [this order] shall constitute an admission that Erhart or anyone acting on his behalf has committed any wrongful act, including without limitation any conduct alleged in the complaint filed in this action.

Each Order also permits Erhart to continue to communicate with regulators "in his capacity as a whistleblower," even while noting that "BofI disputes that Erhart is a whistleblower, and does not waive" its claims.  Moreno Decl Exs. B, pp.2-3, C, p.3.  Thus, rather

---

[13] The joint motions make clear that these TROs were stipulated orders between the parties, as a matter of mutual convenience, and having nothing to do with the merits.  The initial joint motion states that the parties simply wanted to avoid additional motion practice while BofI's motion for a preliminary injunction was pending; and the supplemental order was a trade-off so that Erhart could obtain additional time on the preliminary injunction motion.  Sommers Decl. Exs. 3-4 .

than supporting a *prima facie* showing by BofI, the TROs refrain from doing so – consistent with the stipulated motions that produced them. Sommers Decl. Exs. 3-4. There is simply no inference that can be drawn from these TROs regarding the merit, or lack thereof, of BofI's case against Erhart.

Further, BofI can make no *prima facie* case regarding its speculative theory of a "short seller scheme" that it claims to be "investigating." Its First Amended Complaint against Erhart in the underlying case contains no such claim (see Moreno Decl. Ex. A), and BofI has not shown any factual basis in the instant proceeding for such speculation.

As BofI has failed to make a concrete prima facie case of actionable harm, this factor also weighs in favor of denying compelled discovery and quashing the Subpoenas.

### C.   **BofI Has Alternative Sources.**

BofI contends that it has no alternative means to obtain the anonymous author's contact information and that if BofI knew the identity of these Authors, the Subpoenas of SAI would be unnecessary. BofI Mem. 15. But these Subpoenas are unnecessary. BofI could have contacted those Authors directly itself by one of three ways, all indicated to any viewer on the Seeking Alpha website, and all indicated to BofI on the actual webpages that BofI has inaccurately copied and submitted on its motion. BofI could have direct messaged the Author by either clicking on the "Send Message" link that appears below the author's pseudonym at the top of all of the Author's Articles, or by clicking on the "envelope" icon on the Author's webpage. Hoffmann Decl. ¶9; Sommers Decl. ¶11 & Ex. 2. Seeking Alpha's Policy on Anonymous Contributors (Moreno Decl. Ex H; Hoffmann Decl. Ex. A) provides a third method: "If you would like us to forward an inquiry to an anonymous author, please email contributors [at] seekingalpha.com." So BofI could have bypassed subpoenaing SAI.

18

Moreover, Erhart is a defendant in BofI's suit, and can be asked at deposition about the Articles about which BofI has a "concern," as well as their Authors.  BofI admits that Erhart was ordered "to identify all individuals and entities to whom he transmitted BofI's confidential information."  Moreno Decl. ¶7.  Presumably he did not identify Real Talk Investments or Aurelius or the posters of any of their Articles.  BofI can also subpoena any individuals he did disclose to examine them as to what they know about the Articles.  This factor does not support compelling disclosure from SAI.

**D.  BofI's Subpoena Is Not "Narrow and Discrete" As Claimed.**

BofI misstates that the Subpoenas just "call[ ] for information *sufficient to identify* the Seeking Alpha anonymous posters 'Real Talk Investments' and 'Aurelius.'"  BofI Mem. 14 (emphasis added).  The requests for "any and all records and documents regarding the identification" of the person(s) who posted the Articles, and the Authors, are completely overbroad, even were there a claimed need (which there is not).  They encompass many documents that are wholly unrelated to articles about the controversy between BofI and its former auditor, or even to the identities of the Authors.  Indeed. they encompass *any* document that merely contains the name of any of these persons (for example, all their e-mails), regardless of its content.  Likewise, if the person(s) who clicked to post the Articles did not author or supply the content, the Subpoenas nevertheless seek all documents with their names on it (which would include every one of their emails, as well).  In addition, the Subpoenas encompass a substantial number of documents revealing extremely personal information, as shown *infra*.  These are simply not Subpoenas calculated to seek "production of less than a page of information" as BofI contends (BofI Mem. 3).  Indeed, they pose an undue burden for SAI.  See pp.23-25, *infra*; Hoffmann Decl. ¶¶22-27.

### E.  **The Anonymous Targets Have a Reasonable Expectation of Privacy.**

As the Subpoenas indicate, the requests encompass a large amount of very personal information, including but not limited to social security, tax id and bank numbers, personal and/or business addresses and email addresses, phone numbers, other "information that is associated with the [author's] Account," such as passwords or other private matters of the Authors and any persons who posted the Articles.  The privacy interests inherent in this information is obvious, yet BofI does not even attempt to explain why this is necessary or relevant.

Nor has BofI defined the type of information it expects SAI to produce responsive to the requests for the "browser/device used by the person or persons who authored the Postings" (Requests 1b. and 3b.), or the timeframe of "use[ ]" it expects SAI to cover in responding to these requests.  The requests are undeniably "vague and lacking in reasonable particularity and specificity," as SAI properly raised in its Objections.  However BofI would define "browser/device used," it has not even ventured an explanation for why such information is relevant or necessary.

"This apparent disregard for the privacy and the First Amendment rights of the online users" should "weig[h] against" BofI "in balancing the interests here."  *Doe v. 2themart.com, Inc.*, 140 F.Supp. 2d 1088, 1096 (W.D. Wash. 201).  In sum then, a balance of all the relevant factors favors SAI's First Amendment qualified privilege. BofI's motion to compel should be rejected. Instead, the Subpoenas should be quashed.

### II.    **BOFI HAS FAILED TO MEET BASIC REQUISITES FOR COMPULSION**

BofI also failed to satisfy the requisites for discovery – indeed, for issuing the Subpoenas in the first place on nothing but mere speculation.  "The party seeking the discovery must make a prima facie showing, that the discovery sought is more than merely a fishing expedition."  *Evans v. Calise*, No. 92-cv-8430, 1994 WL 185696, at *1 (S.D.N.Y. May 12, 1994).  BofI has made no such showing here.

BofI attempts to wrap itself in Fed. R. Civ. P. 26 and 45.  But it ignores basic limitations those rules impose on a party's unfettered attempt, as here, to equate "need" and "relevance" with mere conjecture – particularly, based on Articles that contradict it.  BofI omits a significant portion of the amended Rule 26(b)(1), which provides, in part:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

BofI has not shown that the information it seeks is relevant to its claim, or proportional to the needs of the underlying case.  Indeed, BofI has not shown that it is needed in the case at all. BofI contends that it should be permitted to test under oath the Authors' stated lack of contact with Erhart, and use of BofI's confidential information; and "investigat[e]" whether they have "participated in a short seller scheme" with Erhart.  But it has demonstrated no more than an unfounded "concern[ ]" and attempts to create a claim, where none exists in the underlying case at all.  Such a fishing expedition is not a proper use of Rule 26, much less Rule 45.  As the *Evans* Court also recognized as a general principle, 1994 WL 185696, at * 1 (citation omitted):

> Fed. R. Civ. P. 26(b)(1) does not allow a party "to roam in shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so."…

*See also U.S. v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974) (disclosure should not be directed to permit "a fishing expedition").  It certainly is not a reason to burden SAI, disrupt its relations with its contributors and cause it to incur the lost time and expense involved in responding to the Subpoenas and BofI's motion.

Rule 45 offers protection to a witness, affirmatively requiring a party serving a subpoena "to take reasonable steps to avoid imposing undue burden or expense" on the recipient –

*especially* if the recipient is a non-party.  Fed. R. Civ. P. 45(d)(1).  A non-party witness to the underlying litigation is entitled to consideration regarding expense and inconvenience.  Fed. R. Civ. P. 45(d)(2)(B)(ii) ("an order [on a motion to compel] *must* protect a person who is neither a party nor a party's officer from significant expense") (emphasis added).

"[T]he Court should be particularly sensitive to weighing the probative value of the information sought against the burden of production on [a] non-party."  *Manolis v. Brecher*, No. 11 Civ. 2750, 2013 WL 4044808, at *3 (S.D.N.Y. Aug. 9, 2013) (citation omitted)(granting motion to quash subpoena and denying leave to file motion to compel and for sanctions).  Where a subpoena targets a non-party, courts may impose broader restrictions.  *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 49 (S.D.N.Y. 1996).

In determining whether a subpoena imposes an undue burden, the Court looks not only at relevance, and the burden imposed, but also at, among other things, the need for the documents.  *Dial Corp. v. News Corp.*, No. 13-cv-6802, 2015 WL 3778533, at *2 (May 19, 2015)(motion to quash granted where subpoena proponent failed "to demonstrate a need" for documents sought); *Cohen v. City of New York*, No. 05 Civ. 6780, 2010 WL 1837782 (S.D.N.Y. May 6, 2010) (request denied to obtain from witness organization that arranged to document police activity at a Republican National Convention, the identities of witnesses who recorded videos or took notes); *Concord Boat Corp.*, 169 F.R.D. at 49.  "A subpoena that 'pursues material with little apparent or likely relevance to the subject matter,' however, is likely to be quashed as unreasonable even where the burden of compliance would not be onerous."  *Kirschner v. Klemons*, No. 09 Civ. 4828, 2005 WL 1214330, at *2 (S.D.N.Y. May 19, 2005) (*citing Concord Boat Corp.*, 169 F.R.D. at 50).

The Court also examines whether the information sought can be obtained elsewhere.

22

*Corbett v. eHome Credit Corp*, No. 10-cv-26, 2010 WL 3023870, at *3 (E.D.N.Y. Aug. 2, 2010) (motion to quash granted where documents were obtainable from another source and were tangential). [14]

As shown *supra*, there is virtually no probative value of and no need for the speculative information sought by BofI should SAI be compelled to produce the identifying information sought despite its First Amendment protections.  BofI can depose Erhart as to whether he has spoken with Real Talk Investments or Aurelius, or about their Articles.  If Erhart has not named them as persons to whom he disclosed any confidential information in the disclosure that BofI noted, that just confirms the lack of any probative value or need to confront these Authors.  And as shown below, the Subpoena, and particularly compulsion, will unduly burden SAI.  BofI has not shown otherwise.

## III.     THE SUBPOENAS ARE UNDULY BURDENSOME

There is no question that the Subpoenas are burdensome – indeed, unduly so, particularly when balanced against their lack of probative value.  Compelling compliance with the Subpoenas would negatively impact the protection that has permitted rigorous and insightful postings that promote a full discourse on subjects covered by contributors, and the sometimes groundbreaking research or commentary that spotlights wrongful activities.  That is a First Amendment protection that Seeking Alpha treats seriously, and it safeguards against any untoward attempt of BofI to pressure the authors about their statements and disclosed public sources so as to intimidate and silence vocal critics of BofI's business conduct.   Hoffmann Decl. ¶22.

---

[14] The Court should also be guided by Rule 26(b)(2)(C), which provides, *inter alia*, that a court may limit discovery if "the discovery sought . . . can be obtained from some other source that is more convenient, less burdensome, or less expensive." Where the discovery sought from a non-party is obtainable from a source more direct, convenient, and less burdensome, the subpoena should be quashed. *See, e.g.*, *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 577 (N.D. Cal. 2007)(subpoena quashed where information should be sought from party defendant).

Enforcement of the Subpoenas, and others like them, simply because articles were posted on Seeking Alpha, also would threaten to disrupt Seeking Alpha's relationship with its pseudonymous contributors, who would be less likely to post on Seeking Alpha, and even less likely to cover powerful subjects such as BofI if their identities could be unmasked by the simple service of a Subpoena, particularly one apparently based only on speculation, as here. Hoffmann Decl. ¶23.

The Subpoenas have already taxed SAI's limited budget and resources and distracted its staff from carrying out SAI's primary function.  The time that personnel and outside counsel have spent reviewing and objecting to the Subpoenas and responding to BofI's motion, and the associated costs involved, already have been substantial.  Hoffmann Decl. ¶24.

Disclosure in this case may well prompt others unhappy with unfavorable coverage posted on Seeking Alpha to similarly attempt to pressure their critics by seeking compelled disclosure, further impairing open and public discussion of securities and diminishing the confidence of Seeking Alpha's users to speak freely, and burdening SAI's resources while distracting its personnel even further.  Hoffmann Decl. ¶25.

As shown, *supra*, the scope of the Subpoenas encompasses many documents that are wholly unrelated to articles about the controversy between BofI and its former auditor, or even to the identities of pseudonymous authors "Real Talk Investments" or "Aurelius."  The requests for "Any and all records and documents regarding the identification" of the person(s) who posted the Articles, and of the two pseudonymous Authors, which encompasses *any* document that contains the name of any of these persons is overbroad.  Even if as a technical matter the person(s) who clicked to post the Articles listed in the Subpoena did not create or develop the content of those articles, the Subpoenas nevertheless seek all documents with their names on.  In addition, the

24

Subpoenas encompass a substantial number of documents revealing extremely personal information, as indicated *supra*.  Hoffmann Decl. ¶26.

SAI does not have a shared server.  Compliance with the Subpoenas would require searching for responsive documents on individual computers, as well as searching for and retrieving responsive information from archived databases.  In addition, as production would encompass a substantial number of documents revealing extremely personal information – such as indicated above – SAI would have to engage counsel to perform a confidentiality review of the potential production.  Moreover, responding to the present requests could span a period of some 7-14 days, require staff to spend additional hours that would take their time and attention away from their main functions, and potentially require engaging a third-party vendor to ensure collection of all requested documents.  This in itself would unduly burden SAI's resources.  Hoffmann Decl. ¶27.  *See Am. Broad. Cos. v. Aereo, Inc.*, No. 13-MC-0059, 2013 WL 276124, at *7 (N.D. Iowa Sept. 17, 2013)("When a non-party is subpoenaed . . . the Court is 'particularly mindful' of Rule 45's undue burden and expense cautions.") (citation omitted) (granting motion to quash).

## CONCLUSION

BofI's motion to compel should be denied and its Subpoenas to SAI should be quashed.

Dated:   New York, New York
      February 3, 2016

MILLER KORZENIK SOMMERS RAYMAN LLP

By    /s/ Louise Sommers
          Louise Sommers
          David S. Korzenik
          Terence P. Keegan
488 Madison Avenue Suite 1120
New York, New York 10022-5702
Phone (212)752-9200   Fax (212) 688-3996
lsommers@mkslex.com
dkorzenik@mkslex.com
tkeegan@mkslex.com
Attorneys for Respondent Seeking Alpha, Inc.