G29KSEEM

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  BofI FEDERAL BANK, A Federal
   Savings Bank,
4
                  Plaintiff,
5
             v.                              16 MC 25 (JPO)
6
   SEEKING ALPHA, INC.,,
7
                  Defendant.
8
   ------------------------------x
9                                         New York, N.Y.
                                          February 9, 2016
10                                        11:45 a.m.

11 Before:

12                    HON. J. PAUL OETKEN,

13                                        District Judge

14                         APPEARANCES

15 SHEPPARD MULLIN RICHTER & HAMPTON LLP
        Attorneys for Plaintiff
16 BY:  THOMAS KcKEE MONAHAN

17 MILLER KORZENIK SOMMERS LLP
        Attorneys for Defendant
18 BY:  DAVID S. KORZENIK
        TERENCE PATRICK KEEGAN
19

20

21

22

23

24

25

G29KSEEM

1          THE DEPUTY CLERK:  Your Honor, this is in the matter

2     of BofI Federal Bank versus Seeking Alpha, Inc.

3          Starting with plaintiff's counsel, can I have all

4     counsel state their appearance for the record, please.

5          MR. MONAHAN:  This is Thomas Monahan, Sheppard Mullin

6     Richter & Hampton, for petitioner, BofI Federal Bank.

7          THE COURT:  Good morning.

8          MR. KEEGAN:  Terence Keegan, with Miller Korzenik

9     Sommers, on behalf of respondent, Seeking Alpha, Incorporated.

10         MR. KORZENIK:  And David Korzenik, on behalf of

11    Seeking Alpha.

12         THE COURT:  Good morning.

13         Gentlemen, this is another miscellaneous matter, 16

14    Misc. 25, and this is a motion to compel compliance with

15    subpoenas, Docket No. 1, and a cross-motion to quash those

16    subpoenas, which is Docket No. 11, on ECF.

17         The initial movant is Mr. Monahan on behalf -- is it

18    BofI?  Is that how you say it?

19         MR. MONAHAN:  It is, your Honor.

20         THE COURT:  I've read all the papers, and I did get a

21    chance to read the reply papers that came in, I think,

22    yesterday, so I think I've read everything.

23         And I will turn it over to you first, Mr. Monahan, to

24    highlight anything you'd like.

25         MR. MONAHAN:  Yes, your Honor.  I won't belabor the

G29KSEEM

1   facts too much since they're set forth in our papers, but as

2   your Honor is aware, my colleagues at Sheppard Mullin in

3   Los Angeles and San Diego have an action pending before your

4   Honor's colleague, Judge Cynthia Bashant, in the Southern

5   District of California.  That underlying action is an action by

6   BofI against their former employee, Charles Matthew Erhart.

7   That complaint relates to Mr. Erhart's theft of confidential

8   and proprietary information from BofI, and many of those claims

9   relate to an unfounded whistleblower action that Mr. Erhart

10  filed in the Southern District of California and also was

11  pending before Judge Bashant.

12          THE COURT:  It is currently pending?

13          MR. MONAHAN:  Yes, your Honor.

14          THE COURT:  When you say "unfounded," that's your

15  view?  No court has said that, right?

16          MR. MONAHAN:  Correct, your Honor.

17          THE COURT:  Okay.

18          MR. MONAHAN:  But that whistleblower complaint was

19  sealed, and the proceedings were confidential until Mr. Erhart

20  leaked those proceedings and leaked his complaint to the New

21  York Times.

22          The action against Mr. Erhart by BofI has been found

23  to be meritorious.  Indeed, BofI has made out a prima facie

24  case which becomes relevant in the context of the law here.  In

25  fact, Judge Bashant has issued a temporary restraining order

G29KSEEM

1    prohibiting Mr. Erhart from distributing any further

2    confidential information and requiring him to return all the

3    confidential information that he stole.

4          THE COURT:  But I understand from the other counsel,

5    that that was on consent.

6          MR. MONAHAN:  I was going to get to that.

7          Yes, your Honor, it is a consented TRO, which I think

8    supports even further that there is no dispute here that

9    Mr. Erhart has taken confidential information from BofI, that

10   he has distributed it, and that he has to return it to BofI.

11   Even Mr. Erhart is not disputing that.

12         In fact, Judge Bashant has authorized BofI to serve

13   third-party subpoenas in order to determine whether persons

14   other than Mr. Erhart have accessed or received the

15   confidential information that Mr. Erhart took from BofI.

16         THE COURT:  Can you tell me about the whistleblower --

17   when was the whistleblower complaint filed, and when was it

18   unsealed?

19         MR. MONAHAN:  It was filed in early October, and,

20   quite frankly, your Honor, I'm not sure if it is unsealed at

21   this point or not, but, obviously, the complaint was shared

22   with the New York Times, so the contents of the complaint have

23   been publicly disseminated.

24         THE COURT:  But it was filed initially under seal?

25         MR. MONAHAN:  It was.

G29KSEEM

1          THE COURT:  By Mr. Erhart?

2          MR. MONAHAN:  By Mr. Erhart.

3          THE COURT:  Okay.  Do you agree that the Sony

4  standard, the five-part standard, is the governing standard in

5  this situation?

6          MR. MONAHAN:  I do, your Honor.  And I think there is

7  no dispute here between the parties that this is the standard

8  that governs.

9          THE COURT:  Now, in Sony itself, and I think in Arista

10  records, they're talking about a situation where content owners

11  are going after potential copyright infringers, and in that

12  case, Judge Chin, and then the Second Circuit, said there's a

13  First Amendment interest in the people doing the downloading,

14  and file-sharing, and all that, although it's somewhat of a

15  weak interest and has limits.  Here you have people doing real

16  speech.  I mean, here you have the anonymous posting is not

17  something weak or sketchy, it's real, it's articles arguably of

18  public concern, public interest.

19          MR. MONAHAN:  Well, your Honor, I would take a

20  different approach to the speech.  This is not political speech

21  or fundamental First Amendment speech, this is commercial

22  speech.

23          THE COURT:  Why do you think it's commercial speech?

24          MR. MONAHAN:  Well, because the two anonymous posters

25  both have short positions in BofI, and are advocating against

G29KSEEM

1    the stock in BofI, and advocating -- they're essentially

2    advocating in favor of their commercial position, which is that

3    BofI, the value of the stock is inflated, and that more people

4    should be on my side with that.  The very --

5              THE COURT:  But --

6              MR. MONAHAN:  The dissemination of these articles

7    benefits that position.

8              THE COURT:  Right.  So that you think they're just

9    proposing a transaction as opposed to saying what is kind of

10   normatively better for people to do in their interests?

11             MR. MONAHAN:  Correct.  I think they're proposing that

12   other people get in on this, get in on their short selling

13   position, because the sentiment and that fact helps them.

14             THE COURT:  In any event, the five-part standard is

15   what it is irrespective of whether it's commercial speech, or

16   downloading speech, or whatever.

17             MR. MONAHAN:  I agree, your Honor.

18             In addition to the five-part standard, we just point,

19   your Honor or, I guess, respondents have pointed out the Doe v.

20   2themart test that the District of Washington has adopted.

21   That's also been adopted in the Western District of Missouri

22   and the Middle District of Pennsylvania, and that seems to be a

23   lesser test.  As I believe we have satisfied the five-part test

24   in Arista, I mean, the question is whether plaintiff

25   established a prima facie claim of actual harm.  Clearly BofI

G29KSEEM

1  has done that here.  We clearly have actionable claims against

2  Mr. Erhart.

3           THE COURT:  Let me focus you on that, because it's the

4  first prong that I think is the most -- maybe in some ways, the

5  most salient here, which is the concreteness of plaintiff's

6  showing of a prima facie case of actionable harm.

7           Now, the articles here talk about information.  They

8  disclaim the use of sources from Mr. Erhart.  I mean, they

9  disclaim having communicated at all with Mr. Erhart, and then

10  they proceed to sort of essentially, I think, talk about the

11  complaint, which is one reason I was asking whether it had been

12  unsealed, because if it's something you can get on the docket,

13  then it's actually just public information.

14           MR. MONAHAN:  Well, it's the complaint and the New

15  York Times article.  Additionally, your Honor, these are very

16  self-serving statements by the authors, and in some

17  instances -- and they're block-quoted in respondent's brief on

18  pages 13 through 15 -- in some instances, these read like they

19  were drafted by a lawyer and are clearly just sort of --

20  they're covering for themselves here to potentially avoid

21  having to sit down at a deposition and say whether or not they

22  have spoken with Mr. Erhart.

23           THE COURT:  But is there anything in any of the

24  articles that is not part of a public filing in the case or

25  something from the New York Times article?

G29KSEEM

1          MR. MONAHAN:  We have not identified anything, but --

2          THE COURT:  So, what reason is there to think that

3     it's from some sort of separate communication from Erhart?

4          MR. MONAHAN:  Well, there's a difference between a

5     filing and an article and Erhart perhaps contacting these

6     people and directing them to a specific filing in an article or

7     directing them to a filing in a case and saying, you know, go

8     here, go here, putting all these pieces together.

9          THE COURT:  Would that be within the TRO if he called

10    them and said, oh, look on PACER, there's a filing, and if you

11    look at this, and it's totally public, he's just pointing them

12    to something that's public, would that then be within the TRO's

13    reference to confidential information if it's public?

14         MR. MONAHAN:  I think it would if he is pointing out

15    where confidential information has been disclosed in the past

16    and essentially providing a roadmap.  I think that would

17    clearly violate the TRO.

18              In any event, even if these posters show up and say,

19    you know, here's where I got this information from, it was all

20    the New York Times or it was all these public filings, that

21    goes directly to damages in BofI's claim, because BofI's claim

22    for damages is based on Erhart's leak to the New York Times and

23    the dissemination of that information more broadly, including

24    on financial blogs such as Seeking Alpha.

25         THE COURT:  But if you're trying to find out the harm

G29KSEEM

1    from that, you now know, as a matter of public record, what has

2    been put on the blog, so I guess all you could do from that is

3    talk to an expert about how many people read Seeking Alpha and

4    then do some extrapolation of damages.  How does knowing who

5    wrote the blog posts provide any more information that would

6    help with damages?

7              MR. MONAHAN:  Because it doesn't go to the source

8    material as to where these sources came from, because --

9              THE COURT:  Either way, your theory is that it's all

10   derivative of his improper leaks.

11             MR. MONAHAN:  It is all derivative of his improper

12   leaks, but I have to prove that.  My colleagues in California

13   have to prove that this is derivative of his improper leaks,

14   and if this is somehow pieced together from public information,

15   SEC filings, other filings, we need to be able to establish --

16   you need to prove causation in order to get to that damages

17   point.  I agree that damages would be a part of expert

18   testimony, but where the information comes from is vitally

19   important to causation and to --

20             THE COURT:  But the articles say, according to a

21   lawsuit and according to the New York Times, et cetera.  So, we

22   all know it came from his lawsuit and his -- you say his leak

23   to the New York Times.  So, what else do you have to prove?

24             MR. MONAHAN:  Well, you have to authenticate that

25   that's actually the case.  All you have is an anonymous article

G29KSEEM

1   and no ability to actually put that into evidence.  I don't

2   think that the article comes into evidence in a proceeding

3   before the Southern District of California.  The article is

4   hearsay, and there's really no basis for us to get that article

5   in absent this testimony.

6          I think the other --

7          THE COURT:  I'm not sure -- actually, I don't want to

8   make your argument for you, but I'm not sure it would be

9   hearsay because I don't think it would be for the truth of the

10  matters asserted.

11         MR. MONAHAN:  Well, it would be for the truth as to

12  where the sources -- as to what those sources were.

13         THE COURT:  Okay.

14         MR. MONAHAN:  I mean, you need to prove where the

15  evidence came from in order to establish the causal link, and

16  that would be what we seek to do if the self-serving comments

17  and the self-serving statements in these articles prove true,

18  and these folks haven't spoken to Mr. Erhart or aren't, in

19  fact, Mr. Erhart himself or someone acting on his behalf.

20         I think another important issue here is, we have

21  provided notice to the anonymous poster, Aurelius, of these

22  proceedings here today.  After we filed this action in the

23  comments section on Aurelius' article, we posted a notice --

24         THE COURT:  Aurelius is A-u-r-e-l-i-u-s?

25         MR. MONAHAN:  Like Marcus Aurelius, I think.

G29KSEEM

1          THE COURT:  Exactly.

2          MR. MONAHAN:  We posted a comment on his article.

3     Both Aurelius and the other anonymous speaker, who is -- I'm

4     sorry, who's Real Talk Investments is the pseudonym there, we

5     attempted to post a notification on those comments saying that

6     these proceedings were happening in Part I on this date and

7     here's the index number.

8          In Exhibit F and Exhibit G to Mr. Marino's

9     declaration, in those comments, you can see that Aurelius and

10    Real Talk Investments are active in responding to the posts on

11    their articles.  So, the Aurelius one was actually posted.

12    Apparently, any posts you make on a blog at Seeking Alpha have

13    to be approved by moderators.  Our post for Aurelius was

14    posted.  The one to Real Talk Investments, Seeking Alpha, I

15    guess, did not see fit to post that on Real Talk Investments'

16    page.  But Aurelius has been given notice of these proceedings.

17    Aurelius has not objected, has not contacted my office, has not

18    contacted anyone, as far as I'm aware, to say they object to

19    being identified for the limited purpose that we've asked here.

20         We've attempted to do the same with respect to Real

21    Talk Investments and have been stymied by Seeking Alpha, and I

22    think that Seeking Alpha lacks standing to raise the First

23    Amendment issues that they're raising here.  The First

24    Amendment issues at issue here, the anonymity, does not belong

25    to Seeking Alpha and is not Seeking Alpha's to raise.

G29KSEEM

1    THE COURT:  You didn't argue this in your papers, did

2    you?

3    MR. MONAHAN:  We did in our reply papers.  We cite to

4    Chevron Corp. v. Donziger, which is a Northern District case.

5    It's 2013 WL 3228753.

6    And with that, your Honor, I would just run down the

7    specificity of the requests.  If Seeking Alpha attempts to make

8    the argument that we're seeking -- that the subpoena is broader

9    than it is, we have, in meet-and-confers, said, listen, all we

10   want, we don't want any bank information or whatever other

11   information, we just want a name and an address, we want to be

12   able to ask these people questions and depose them under oath,

13   particularly with respect to those self-serving comments and

14   where they're getting the confidential information that's

15   contained in your articles.

16   The absence of an alternative means we've attempted to

17   contact Aurelius and Real Talk through the comments.  Seeking

18   Alpha has inhibited us from contacting Real Talk.  We've posted

19   on Aurelius.  There's been no response as of last night on the

20   post, and we've received no comments either.

21   If Mr. Erhart is directing these folks, he's not going

22   to disclose that, either, in discovery in our action, and

23   that's that.

24   And, again, the central need for these subpoenaed

25   materials, they go directly to causation, they go directly to

G29KSEEM

1    damages, and I think the expectation of privacy is rather low

2    here, actually, your Honor.  The policies posted on Seeking

3    Alpha's website with respect to anonymity make very clear that

4    these parties are subject to subpoena, that process and court

5    orders, including investigations by the SEC, Seeking Alpha may

6    be required to respond to, and they do, in fact, provide their

7    contact information, and according to Seeking Alpha in their

8    papers, apparently a lot of additional financial and other

9    sensitive information to Seeking Alpha.  They, in turning that

10   over, have given notice their expectation that if there is a

11   proceeding like this one, their identities may be disclosed.

12              THE COURT:  Okay.  I think that answers my questions.

13              MR. MONAHAN:  Thank you, your Honor.

14              THE COURT:  Thank you, sir.

15        I'll hear from Mr. Keegan or Mr. Korzenik.

16              MR. KEEGAN:  Your Honor, good morning.  Terence

17   Keegan, for Seeking Alpha.

18              THE COURT:  Good morning.

19              MR. KEEGAN:  I'd like to touch on a number of

20   misstatements that counsel made.

21        First, as your Honor correctly noted, this is an

22   anonymous speech case, and that's why the Arista and Sony

23   standard applies here.

24        As to the standing issue that was just touched upon,

25   that position is not true in the Dendrite line of cases that

G29KSEEM

1    you've seen over the past decade or so, not true in any of the

2    First Amendment cases that Seeking Alpha has been a respondent

3    to.

4            THE COURT:  So, they have been able to assert the

5    anonymous poster's First Amendment rights essentially?

6            MR. KEEGAN:  That's correct.  The NanoViricides case,

7    which I believe was from a year or two ago, in state court, one

8    of the most recent matters in which Seeking Alpha

9    successfully --

10            THE COURT:  That was in New York Supreme?

11            MR. KEEGAN:  That's right.

12            THE COURT:  Do you know which justice?

13            MR. KEEGAN:  Justice Kern, if I remember correctly.

14            -- in which she denied the request for preaction

15    disclosure from Seeking Alpha.

16            But it goes back even further, the Deer Consumer

17    Products case from 2011 in which Seeking Alpha did not have to

18    give up any information as to the anonymous author.  I think

19    what the Deer case particularly shows, and this is in your

20    papers as well, is just how serious this First Amendment issue

21    is and how serious it is for Seeking Alpha.  This is Seeking

22    Alpha's business.  This is a relationship with its authors who

23    choose to have a pseudonym, and it's a relationship with the

24    audience who trusts the editorial integrity of this information

25    and the quality on which they can review all of this

G29KSEEM

1    information and make investment decisions.

2              That leads me to speak about the so-called commercial

3    speech that is in the BofI's reply.  This speech does not

4    propose a commercial transaction at all.  Both of the authors

5    disclose that they have a short position in the BofI stock.

6    They do not represent that they have closed any trades on BofI,

7    they do not propose that the readers take a short position.

8    They merely bring this information to light, and it plays in to

9    what Seeking Alpha is about.  It's boosters of a stock, critics

10   of a company, and that the tagline on Seeking Alpha's home

11   page, which is also in our papers, is read, decide, invest.

12   And that's what the readers do, they take pro positions, they

13   take positions against, and they make up their own mind.

14             And the articles, and which your Honor noted, all

15   point to the publicly available sources from which they receive

16   the information.  This is where I got this, links to the

17   material.  So, everything is disclosed.  And these are the

18   judgments that the individual authors made from it.

19             THE COURT:  I'm with you on the fact that the --

20   there's really no indication that the articles are based on

21   anything other than information that has been made public, but

22   I'd like you to address the idea that they need -- for damages

23   purposes in their case, I guess, in California, they need to

24   get the exact source, so they can connect the dots and prove

25   causation for purposes of damages and so forth.

G29KSEEM

1          MR. KEEGAN:  Sure.  To that point -- and I think this

2     also goes to within the Arista and Sony factors, the central

3     need for the information.  You heard counsel talk about the

4     suggestion that Mr. Erhart is, quote, directing these authors.

5     There is nothing in the facts in this case to support that

6     accusation.

7          What there is, is right from, I believe, a day or two

8     after the New York Times article and a day or so after, there

9     was a drop in the BofI stock in mid-October.  You have BofI's

10    chief executive in a conference call with analysts, a publicly

11    disclosed conference call, "By the time we are done, we will

12    find a coordinated effort with the media, with short sellers,

13    and with Mr. Erhart to provide a variety of material nonpublic

14    information."

15         So, this conspiracy theory that has been -- it's been

16    part of BofI's so-called investigation from the start, but

17    that's not part of their lawsuit.  Their lawsuit is about

18    Mr. Erhart's alleged disclosure of confidential information.

19    The authors fully disclose where they received their materials

20    from.  There was nothing to suggest in the articles that they

21    spoke with Mr. Erhart, just as their disclosures say, and they

22    may be carefully worded, but they're thoroughly worded to try

23    to ward off this very sort of attempt by BofI, which, from the

24    start, has been the chief executive's directive.

25         THE COURT:  What about the idea, though, that they

G29KSEEM

1    need it for sort of damages in the claims that they have

2    asserted?  In other words, the idea that we need to connect the

3    dots as to causation as to how this information got where and

4    to this blog so we can connect it all back to Mr. Erhart?

5              MR. KEEGAN:  Sure.  I think that that's an attenuated

6    claim by BofI.  It also goes to the factor within the Arista,

7    Sony decisions as to the availability of alternative sources.

8              Now, Mr. Erhart is available to deposition by BofI.

9    We have nothing before us that BofI has asked Mr. Erhart who

10   else did you disclose this to, did you disclose information to

11   Seeking Alpha, are you in contact with Seeking Alpha authors.

12   Nothing to suggest that BofI has ever shown Mr. Erhart the

13   articles that are at issue in these subpoenas.  What they do

14   say is that it's not rational -- I think I'm using the words

15   from their reply -- to think that Mr. Erhart would give a

16   straight answer, an answer under oath, which is not rational.

17             But to the point, they haven't taken that step and --

18   before subpoenaing Seeking Alpha for any and all identifying

19   information as to these authors and posters.

20             That's another thing that I wanted to correct:  In the

21   reply, we see that BofI is only seeking for a single page of

22   information, just the name, address, and telephone number.  But

23   I'd like to hand up a copy of the actual requests, so that I

24   can read them.

25             THE COURT:  Yes, I have it.  You mean the actual

G29KSEEM

1    subpoena?

2            MR. KEEGAN:  The actual subpoena, yes.

3            THE COURT:  Yes, I have it.

4            MR. KEEGAN:  Question number 1:  Any and all records

5    and documents regarding the identification of persons who

6    posted the articles."

7            Request number 2:  Any and all records and documents

8    regarding the identification of the person or persons

9    identified as Real Talk Investments.

10            Request number 3:  Any and all records and documents

11    regarding the identification of the person or persons who

12    posted the articles.

13            And finally, request number 4:  Any and all records

14    and documents regarding the identification of the person or

15    persons identified as Aurelius.

16            THE COURT:  Well, couldn't we treat that -- yes, you

17    could argue that any and all records regarding the

18    identification could be construed paroled, but they've now said

19    all we want is name and address, so shouldn't I treat that as

20    effectively the request?

21            MR. KEEGAN:  Well, even if your Honor did, we think

22    that's improper and totally inappropriate here.  We asserted

23    the objection on the First Amendment, on the factors of the

24    Arista and Sony cases from the start.  And it goes to Seeking

25    Alpha's policy as stated, as I think mischaracterized by

G29KSEEM

counsel, that Seeking Alpha would give up this information and
that authors are to have a minimal privacy expectation from the
website.

        We've defended requests like this, demands for this
information for years going back to the Deer case in 2011 and
through to the present.  We're in state court now with another
editor in which the plaintiff in that case actually does
request the name, address, and telephone number of an author,
and we oppose that as improper there, and we oppose it as
improper here.  There was no basis to break the author's First
Amendment privilege, Seeking Alpha's First Amendment privilege
of this material, where there is such an absence of a prima
facie showing of actionable harm, such an absence of a central
need for the information here, such a lack of exhausting the
effort of clearly alternative means of obtaining this
information.

        That's the other thing that I wanted to point out:
They said that they had submitted a notice for comments on
Seeking Alpha.  I understand from our client that the notice
from Real Talk Investments has been restored to the site, that
it was a technical issue.  It certainly was not us instructing
Seeking Alpha not to put it up, part of the sort of wild
accusation to vilify not only our client, but us.

        But what they do acknowledge in their reply is that
the comments have to go through a moderator, and when we were

G29KSEEM

1  on the phone with BofI counsel, my colleague, Ms. Sommers,

2  suggested and others have directly contacted the authors of the

3  articles -- of other articles through Seeking Alpha right on

4  the article page underneath the author's name, send message.

5  You send a direct message to the author.  There's another way

6  of doing it through Seeking Alpha through the author profile,

7  you send a direct message.  They have not attempted to do that.

8  And if they couldn't see that on the Seeking Alpha pages for

9  themselves, they've seen it in our papers.  They have had our

10 papers for a week, they have not attempted to do that.

11         Just to reiterate one thing that counsel did say in

12 response to your Honor's question:  They have not identified

13 anything in terms of confidential information that came from

14 the underlying case and that appears in the Seeking Alpha

15 articles, that appears in the articles at issue.

16         THE COURT:  Let me just ask you if you know the answer

17 to the question when the complaint, the whistleblower

18 complaint, was unsealed?

19         MR. KEEGAN:  I would have to check, your Honor.

20         THE COURT:  Okay.  Do you know if it's available now

21 on PACER or publicly?

22         MR. KEEGAN:  I do believe it is.

23         THE COURT:  Okay.

24         MR. KEEGAN:  I do believe that all these materials are

25 public, but, again, that's my understanding, but I would have

G29KSEEM

1    to check.

2              THE COURT:  Okay.  Thank you, Mr. Keegan.

3              MR. KEEGAN:  Okay.

4              THE COURT:  Is there anything you'd like to reply to

5    Mr. Monahan?

6              MR. MONAHAN:  I have a few things to reply to.  I

7    mean, the question is not whether the records are unsealed as

8    of today, the question is were the records unsealed when

9    Aurelius and Real Talk Investments posted their article.

10             To the point of this not being commercial speech and

11   not proposing transactions, Real Talk Investments has not

12   posted a single article other than articles about BofI.  Real

13   Talk Investments did not become a contributor to Seeking Alpha

14   until after Mr. Erhart leaked his complaint to the New York

15   Times, and Real Talk Investments does not appear to write on

16   anything other than Seeking Alpha and the short sale that he or

17   she stands to profit by and encouraging the short sale.

18             To the state court actions that they point out that

19   Seeking Alpha has apparently been successful in protecting this

20   First Amendment right that they claim they may do so on behalf

21   of third parties, in the Deer Consumer Products case, that

22   third party, the nonparty, was ultimately unmasked by the court

23   and actually ends up as a party to that litigation in the state

24   court.  Seeking Alpha was subject to defamation and libel

25   claims by the plaintiff in the Dear Consumer Products action

G29KSEEM

and were dismissed from the action, but the case proceeded

against the anonymous party, and, ultimately, the anonymous

party was -- the identity was unveiled.

So, the idea that these state court claims should

override the Chevron case, the federal standard, that they

don't have standing here, I think, should be rejected.

The point that the subpoena is somehow overbroad

completely undermines the meet-and-confer process between my

colleagues in Los Angeles and my brother at the bar's here,

Ms. Sommers, back at their offices.  During those

conversations -- and it's very clear in Mr. Marino's

declaration -- we have made clear that all we want is the

identifying information sufficient to identify these authors,

find out their sources, and find out whether they have ever had

communication with Mr. Erhart.  We've made that clear from the

moment we began meeting and conferring with them on this, and

that's just not the case.

And with the notice issue, with the claim technical

issue, this is just a symptom of what we have been encountering

with -- and I certainly don't impugn counsel for it -- but with

Seeking Alpha themselves.  We attempted to serve the subpoenas

on Seeking Alpha multiple times.  Every time our process server

went there, she spoke with someone at Seeking Alpha upstairs --

the security guard spoke with someone upstairs, and he was

denied access to the premises.

1          The declaration from Mr. Hoffman has no probative

2     value whatsoever because Mr. Hoffman is located in Israel.  It

3     appears that Mr. Hoffman's executive page that showed that he

4     was located in Israel was removed from the Seeking Alpha

5     website.  It's no longer accessible until we find it deeply

6     embedded somewhere in their website.  They clearly are trying

7     to frustrate this beyond the judicial process, beyond the

8     Court, and claiming now that the posts for Real Talk

9     Investments was a technical glitch, I think, just is

10    disingenuous in this context.

11         And with that, your Honor, I'd request that our motion

12    be granted.

13         THE COURT:  Okay.  Thank you.

14         MR. KEEGAN:  Your Honor, just to quickly respond.

15    Regarding Mr. Hoffman, Mr. Hoffman executed his declaration in

16    New York while he was here.  This allegation of scrubbing is

17    just wild.  Mr. Hoffman has submitted declarations and

18    affirmations, affidavits, in a number of these sorts of other

19    cases.  It is clear that we have defended -- resisted subpoena

20    attempts like this before many times.  There is just no basis

21    for saying that Seeking Alpha is attempting to avoid service,

22    which is clear in our papers.

23         As to the declarations from the two process servers,

24    which BofI, save for its reply, to sort of shape the facts of

25    what that was allegedly about, speaking with a security guard

G29KSEEM

in Seeking Alpha's building as to who has accepted it and who

is authorized to accept service of process, has no weight, and

in any event, this is Thanksgiving week where they receive

confirmation that executives from Seeking Alpha, that the

office itself is closed.  So, I think that all goes by the

wayside.  In any event, this is ultimately a sideshow, just

getting us away from the key issues here.

My colleague, Mr. Korzenik, would like to just comment

on one thing about the Deer case.

MR. KORZENIK:  Thank you, your Honor.

THE COURT:  Yes.

MR. KORZENIK:  Just a minor -- a minor, but important

point regarding the Deer case.  Yesterday, out in supreme

New York, Westchester, we were arguing that my adversary made

the very same argument about Deer, that the plaintiff had, in

fact -- the anonymous poster indeed had been disclosed.

Something very special about that:  We were not required to

disclose the identity of that anonymous poster.  That poster

appeared in the action because he was named as a Doe, and he

decided to defend himself on a jurisdictional basis and wanted

to do so on an anonymous basis.  The court said, well, if you

want to appear here, and you want to defend yourself on a

jurisdictional basis, then you must tell us who you are and

where you are.  But we were not compelled to disclose.  In

fact, the Court made clear we did not have to disclose the

G29KSEEM

1    identity.

2            I'll make a closing point that is instructive to us in

3    terms of why we wield the anonymous speech right and take it so

4    seriously.  In the Deer case, the Deer company, it's a Chinese

5    company that was listed on the U.S. security -- in the United

6    States securities NASDAQ.  Alfred Little, the anonymous poster,

7    that was his pseudonym, had written an article saying I'm a

8    short seller, I'm a short, and these guys are running a

9    fraudulent company.  I've watched them closely, he had people

10   watching their factories to see whether the trucks coming in

11   and out were actually delivering the quantity of goods that

12   they claimed in public filings.  They were not.  And he put

13   that stuff onto our website.  He wanted to be anonymous.  We

14   stood by that anonymity, and we believe that that was fair, and

15   right, and correct.

16           It turned out that, ultimately, he was absolutely

17   right.  Deer was delisted for all of the reasons that he set

18   forth in his article.  And this guy is a very honorable man.

19   Later, some of the people who helped him investigate this

20   Chinese company wound up in jail because the company was

21   connected with the Chinese government or Chinese local

22   officials.  Mr. Little -- I don't remember his real name

23   because we were gone from the case at that point, I did speak

24   with his lawyer about this -- went back to do whatever he could

25   do to get those people out of jail and to let people

G29KSEEM

understand, let the authorities know, that they were watched, that they were supported, that they were protected.

So, there's a moral drive behind this, and what we're really concerned about is that Seeking Alpha constantly gets these subpoenas to break the anonymity of speakers who are legitimate speakers, and it's costly stuff, it's costly to defend, and people bring these subpoenas without the slightest basis.  Confidential information?  Never once identified a single item as confidential.  Communications with these posters?  Not a single basis for asserting that.  Short seller conspiracy?  Nothing more than an outrageous kind of accusation and an angry accusation, perhaps, by the CEO that the lawyers then feel that they have to echo and repeat.  But is there any basis for it?  Not a single bit of it.

And what I think in the long run, I think what we do need is some kind of statement from courts -- we've had it before in Deer and NanoViricides -- that this is an important right, and that the anonymous speech right is an important one. We try to wield it responsibly, and we think we've done so here.  We certainly did that in Deer, and we did it in NanoViricides, and we continue to maintain that struggle as time goes on.

THE COURT:  Okay.

MR. MONAHAN:  Your Honor, just if I may briefly?

THE COURT:  Yes.

G29KSEEM

1          MR. MONAHAN:  This is not the Deer case, this is not

2     any of the other cases that my colleagues, my brothers at the

3     bar, are talking about here.  This is the case before us here.

4     I think we've clearly met the standards under Arista.  In the

5     Deer case, there was email service provided by the court by the

6     Supreme Court here in New York, and Mr. Little was served

7     through email service.  If there's an alternative service that

8     we can get these posters by to get their depositions, we just

9     want to examine them under oath as to whether they've had

10    conversations with Mr. Erhart and what their sources are for

11    the articles in order to prove our case in the Southern

12    District of California.

13         THE COURT:  Okay.  Thank you.  I'm prepared to rule.

14         Currently before me is a motion to compel compliance

15    with subpoenas, and the movant on that is Seeking Alpha, that's

16    Docket No. 1, and a cross-motion -- I'm sorry, motion to compel

17    compliance is by BofI Federal Bank, Docket No. 1.  The

18    cross-motion to quash subpoenas is filed by Seeking Alpha, and

19    that's Docket No. 11.

20         The motion to compel compliance is denied, and the

21    cross-motion to quash the subpoenas is granted.  The parties

22    agree that the governing standard is Judge Chin's decision in

23    the Sony Music versus Doe case, which was essentially adopted

24    in the Arista Records decision of the Second Circuit, and there

25    are five factors under this.  I think there's at least a strong

G29KSEEM

1   First Amendment interest at issue here compared with the case

2   like with those two cases.

3           First of all, I think, and I conclude, that Seeking

4   Alpha, under the circumstances, certainly does have First

5   Amendment interest itself and standing itself because it is the

6   purveyor of and a forum for commenters, including anonymous

7   commenters, and it clearly has an interest in allowing that,

8   not only an interest in avoiding the burden of multiple

9   subpoenas, but an interest in continuing its business model of

10   allowing both of those options.

11          Second, I believe that it has the ability, given that

12   business model, to assert the interests of anonymous posters.

13   So, I find that there clearly are the First Amendment issues

14   implicated from the Sony Music factors.

15          Secondly, I find that this does involve core speech,

16   in fact, core noncommercial speech in a way that is clearly

17   stronger in terms of what needs to be protected than Sony Music

18   and Arista cases.  There might be elements of commercial speech

19   here, but I think this clearly involves speech on matters of

20   public interest as well.

21          In any event, even if it were commercial speech, my

22   conclusion would be the same, and the conclusion is:

23   Considering the five factors I've identified, and you've

24   discussed what they are, so I don't need to repeat them, but

25   the significant ones here that cause me to rule in favor of

G29KSEEM

1    Seeking Alpha with respect to these subpoenas are:  First, the

2    concreteness of plaintiff's showing of a prima facie claim of

3    actionable harm, and the fourth one, the central need for the

4    subpoenaed information to advance the claim.

5            Those are factors one and four, which I think clearly

6    cut in favor of Seeking Alpha's position on these subpoenas,

7    and that's because as to the core claim that plaintiff in the

8    California litigation, that BofI, that is, is asserting, it's

9    really speculative to suggest that there's information from

10   these posters and, therefore, held by Seeking Alpha as to their

11   identity that would really be concretely believed to support

12   some claim that they have asserted.  It's really truly

13   speculative.  In fact, the articles on their face suggest that

14   the information is obtained from public sources; that is,

15   public in the sense that the sources were already revealed in a

16   publicly available filing in court and/or from a New York Times

17   article.

18           Second, there is a claim about another theory; that

19   is, a shorting of the stock conspiracy.  Again, that is, I

20   think, speculative in terms of the showing under factor one,

21   and in terms of the central need for the information, which is

22   factor four.  There's really no plausible basis for concluding

23   that there is this short conspiracy such that it would overcome

24   the First Amendment and other interests in protecting the

25   information.

G29KSEEM

1          Indeed, if there really were a shorting conspiracy as

2     to the stock, it would be somewhat odd for the posters to

3     reveal that they're short the stock.  If it were truly a

4     conspiracy, you'd think that they would hide that information.

5     In any event, I find that it's too attenuated.

6          The final theory that I have been able to identify for

7     this is the damages theory, which is that as to the claim, we

8     need to get these identities in order to establish causation

9     and damages.  Again, I find that is much too attenuated, and

10    that the third factor alternative means to obtain the

11    information support denial on that ground.  I just don't think

12    that there is enough of a basis to need the information even

13    for purposes of causation and damages.  Again, it is just much

14    too attenuated.

15         Now, the second factor is specificity of the discovery

16    request.  It's true it's relatively specific, at least as

17    modified or clarified in the parties' papers, and yet, that

18    doesn't overcome the other factors.

19         And, finally, there is the fifth factor of the

20    objecting party's expectation of privacy, and on this, I think

21    there are arguments you could make on both sides.  It's true

22    that the terms of service apparently of Seeking Alpha do say

23    that if you post anonymously, this could be subject to a court

24    order that it be revealed.  Nevertheless, I do think there is a

25    real expectation of privacy both as to the posters of articles

G29KSEEM

1    and as to Seeking Alpha itself because that's part of what it

2    does, is allow people to post anonymously.  So, there is some

3    expectation of privacy.  At the very least, I think the

4    expectation is that there has to be a very good reason for a

5    court to order the identity and other information of people who

6    post revealed, and that certainly has not been met here, in my

7    view.

8            So, for the reasons stated, I find that an application

9    of the Sony Music factors and the First Amendment

10   considerations that underlie those factors call for the

11   quashing of the subpoena and the denial of the motion to

12   compel, and that's what the order on the docket will reflect.

13           Is there anything further today?

14           MR. MONAHAN:  Not from petitioner, your Honor.

15           MR. KEEGAN:  Nothing further, your Honor.

16           THE COURT:  Okay.  Thank you, gentlemen.

17           (Adjourned)

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300